# In the United States Court of Federal Claims

No. 16-1559C

(Filed Under Seal: March 17, 2017 | Reissued March 31, 2017)[*]

<table>
<tr><td>

RIVADA MERCURY, LLC,

     Plaintiff,

  v.

THE UNITED STATES OF AMERICA,

     Defendant,

  and

AT&T CORP.,

     Defendant-
     Intervenor.

</td><td>

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

</td><td>

Keywords: Pre-Award Bid Protest;
Competitive Range Determination;
FAR 15.306; Discussions; Unstated
Evaluation Criteria; Unequal
Evaluation.

</td></tr>
</table>

*Daniel E. Chudd*, Morrison & Foerster LLP, McLean, VA, for Plaintiff. *David A. Churchill*, *Ethan E. Marsh*, and *Sandeep N. Nandivada*, Morrison & Foerster LLP, and *David B. Dempsey*, *Jeffry R. Cook* and *L. James D'Agostino*, Dempsey Fontana, PLLC, Tysons Corner, VA, Of Counsel.

*Jessica R. Toplin*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *L. Misha Preheim*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Chad A. Readler*, Acting Assistant Attorney General, for Defendant.

*Daniel R. Forman*, Crowell & Moring LLP, Washington, DC, with whom were *John E. McCarthy, Jr.*, *James J. Regan*, *Jonathan M. Baker*, *Mark A. Reis*, *Olivia L. Lynch*, *Robert J. Sneckenberg*, *Hart W. Wood*, and *Nkechi A. Kanu*, for Defendant-Intervenor.

---

[*] This Opinion was originally issued under seal, and the parties were given the opportunity to request the redaction of competitively sensitive information. The Opinion is now reissued with redactions indicated by brackets containing ellipses. The Court has accepted the majority of the parties' proposed redactions. It rejected the parties' proposals where it concluded that the information sought to be redacted was not proprietary or competition sensitive or where it determined that redaction of the information would preclude the reader from fully understanding the Court's reasoning.

## OPINION AND ORDER

**KAPLAN, Judge.**

This pre-award bid protest involves a unique and complex procurement which implements a critical public safety recommendation made by the 9/11 Commission. In it, the government seeks a contractor to build-out, deploy, and operate a nationwide public safety broadband network (NPSBN). Once deployed, the NPSBN will transform the nation's emergency response system by consolidating public safety use of the radio spectrum, which will permit emergency responders across the country to use devices that are compatible with one another. The NPSBN will thus enable the public safety community to transition away from a patchwork of antiquated, analog systems and into a modern, digital communication environment.

The plaintiff in this protest, Rivada Mercury, LLC (Rivada), is a telecommunications company formed specifically to pursue the NPSBN contract. It brought this action when, after receiving and evaluating proposals, the procuring agency, the First Responder Network Authority (FirstNet or "the agency"), established a competitive range that excluded Rivada and included only Defendant-Intervenor AT&T Corp. (AT&T). Rivada contends that the agency erred when it allegedly entered into discussions before it established the competitive range and then failed to ensure that those discussions were meaningful and not misleading. Further, it claims that FirstNet's evaluation of its proposal and its decision to eliminate Rivada from consideration were flawed in myriad ways.

The parties have filed cross-motions for judgment on the administrative record. For the reasons discussed below, Rivada's claims lack merit. Accordingly, Rivada's motion for judgment on the administrative record is **DENIED**, and the government's and the intervenor's cross-motions for judgment on the administrative record are **GRANTED**.

## BACKGROUND

### I.     Statutory Background

#### A.          <u>Overview and Purpose of the FirstNet Program</u>

In the wake of its in-depth examination of the September 11, 2001 terrorist attacks, the 9/11 Commission determined that communication problems plagued the public safety response to the emergency. Specifically, radio traffic had overwhelmed existing communications channels, and emergency responders had difficulty coordinating because their radios operated on different bands of the radio spectrum.[1] <u>The 9/11</u>

---

[1] The radio spectrum consists of those electromagnetic waves with wavelengths from approximately 500 KHz to 300 GHz. Harry Newton, <u>Newton's Telecom Dictionary</u> 947–48 (26th ed. 2011). These frequencies are useful for transmitting data because waves in these frequencies induce electric currents in appropriate conductors. <u>See</u> Chambers

Commission Report 319–23 (2004). The Commission thus identified a pressing need for "the expedited and increased assignment of radio spectrum for public safety purposes." Id. at 397.

In February 2012, acting on the Commission's recommendation, Congress created FirstNet, which is an independent authority within the National Telecommunications and Information Administration (NTIA).[2] See Middle Class Tax Relief and Job Creation Act of 2012 (FirstNet Act or "the Act") § 6204, 47 U.S.C. § 1424 (2012). In the Act, Congress directed FirstNet to "ensure the establishment of a nationwide, interoperable public safety broadband network."[3] See 47 U.S.C. § 1422(a).

Congress specified that the NPSBN "shall be based on a single, national network architecture" with two primary components: a "core network" and a "radio access network." Id. § 1422(b). The core network would "consist[] of national and regional data

_____

Dictionary of Science and Technology 954 (Peter M.B. Walker, ed. 1999). Congress asserted federal control over the radio spectrum in 1927. See Radio Act of 1927, Pub. L. No. 69-632, 44 Stat. 1162 (imposing "the control of the United States over all the channels of interstate and foreign radio transmission" and providing for "the use of such channels, but not the ownership thereof, by individuals, firms, or corporations, for limited periods of time, under licenses granted by Federal authority").

[2] NTIA is an executive branch agency located within the Department of Commerce. See About NTIA, National Telecommunications & Information Administration, https://www.ntia.doc.gov/about (last visited March 17, 2017). NTIA "is principally responsible . . . .for advising the President on telecommunications and information policy issues," with a focus on "expanding broadband Internet access and adoption in America, expanding the use of spectrum by all users, and ensuring that the Internet remains an engine for continued innovation and economic growth." Id.

[3] In this context, "interoperability" has been defined as:

> [T]he ability of all authorized local, state[,] and federal public safety entities and users to operate on the NPSBN and commercial partner networks, to access rapid, reliable[,] and secure communication services, in order to communicate and share information via voice and data. These communications services must support existing and future applications and operate across functional, geographic[,] and jurisdictional boundaries.

Admin. R. (AR) Tab 1 at 23 (report of the Technical Advisory Board for First Responder Interoperability, which was convened to lay the technical groundwork for the NPSBN). To achieve interoperability, first responders must use technically interoperable devices— that is, devices with "the ability . . . to successfully exchange data and use information" irrespective of any differences between the devices' manufacturers or the users' service providers. See id.

centers" that would "provide[] the connectivity between the radio access network[] and the public Internet or the public switched [telephone] network, or both." Id. § 1422(b)(1)(A)–(B) (internal subsections omitted). The radio access network would "consist[] of all cell site equipment, antennas, and backhaul equipment . . . that are required to enable wireless communications with devices using the public safety broadband spectrum." Id. § 1422(b)(2)(A).

The Act also instructed the Federal Communications Commission (FCC) to reallocate a substantial portion of the 700 megahertz band of the spectrum for public safety use.[4] See id. § 1411. This portion is known as "Band 14." See AR Tab 1 at 17. Congress further directed the FCC to grant FirstNet an exclusive, ten-year license for the use of Band 14. See 47 U.S.C. § 1421.

## B. FirstNet's Responsibilities and Funding Mechanism

Congress set forth an elaborate set of requirements for FirstNet to carry out in establishing the NPSBN. See id. § 1426(b). As most relevant here, with respect to building and deploying the network, FirstNet was to, among other things, "speed deployment of the network" by "leverag[ing], to the maximum extent economically desirable, existing commercial wireless infrastructure." Id. § 1426(b)(1)(C).

Congress allocated $7 billion to FirstNet to fund the network build-out process. See id. §§ 1426(e), 1457(b)(3). Congress intended, however, that FirstNet would ultimately become "permanent[ly] self-funding." See id. §§ 1428(b), (d). Thus, to meet its continuing financial needs, Congress authorized FirstNet to collect payments for the use of its network capacity and any network infrastructure that it "constructed, owned, or operated." Id. § 1426(b)(4)(C). Such fees could include user fees collected from any "entity, including any public safety entity or secondary user, that seeks access to or use of the [NPSBN]," as well as lease fees for the use of its excess spectrum capacity. Id. § 1428(a)(1)–(2).

## II. Preliminary Procurement Activities and Acquisition Plan

Following its creation, FirstNet spent three years gathering information to lay the groundwork to procure the extensive services it would need to build and operate the NPSBN. Based on the information it collected, FirstNet drafted a fifty-page acquisition plan. AR Tab 28. Noting that the NPSBN undertaking was "an unprecedented Government project," id. at 685, the plan specified that FirstNet's objective was to

---

[4] The FCC has divided the spectrum into bands of frequencies and assigned many of those bands to particular uses; entities wishing to operate within those bands must obtain a license from the FCC (or contract with a license holder). See 47 U.S.C. § 309 (governing the license application process); see also Licensing, fcc.gov, https://www.fcc.gov/licensing-databases/licensing; R.H. Coase, The Federal Communications Commission, 2 J. of Law & Econ. 1, 1–7 (1959) (describing the development of the licensing system).

"maximize the network's value to public safety while meeting its financial sustainability obligations under the Act," id. at 668.

To meet its financial sustainability obligations, the agency planned to have offerors "propose a level of fixed payments to FirstNet over time" based on the offerors' estimations of "the value of FirstNet['s] assets"—i.e., the funds appropriated by Congress and FirstNet's exclusive license to use the bandwidth in Band 14. See id. at 673 (noting that "in addition to the available FirstNet funding, potential offerors may utilize Band 14 excess network capacity and revenues derived from public safety entities, as well as revenue from their commercial users on Band 14, to support the operations of the NPSBN").

Further, FirstNet discussed three types of risks that the project faced: performance and technical risk, cost risk, and schedule risk. Id. at 679–83. It rated each of these risks as "high." See id. For performance and technical risk, FirstNet observed that "[c]oncerns associated with interoperability with opt-out states, reliability/availability, and coverage" could "cause first responder lack of access to NPSBN services at a critical event and lead to loss of life, serious injury, and/or failure to meet mission objectives and requirements."[5] Id. at 679. With respect to cost risk, it noted that "Congressionally allocated funding for the NPSBN" might be "inadequate to execute deployment and operations" if the winning contractor "undervalued" FirstNet's excess spectrum capacity. Id. at 681. Finally, FirstNet assessed the schedule risk as "high" because (among other things) "[t]he current anticipated schedule is aggressive" and "there is a potential that FirstNet may not have enough Government allocated funding . . . to pay for full nationwide coverage . . . resulting in a slower rollout." Id. at 682–83.

## III.    The Solicitation and Source Selection Plan

On January 12, 2016, on behalf of NTIA and FirstNet, the Department of the Interior issued Solicitation D15PS00295 (RFP or "the solicitation"), requesting proposals to build and deploy the NPSBN. Id. Tab 30 at 714, 716. The solicitation explained that "[t]he anticipated contract . . . will be a single award Indefinite-Delivery-Indefinite-Quantity (IDIQ) with fixed price payments to [FirstNet] by the Contractor." Id. at 1373. Offerors were to submit their proposals in three volumes: business management, technical, and price. Id. at 1382. Each volume would be divided into numerous sections and subsections addressing different aspects of the offeror's proposal. See id. at 1382–433.

The RFP informed offerors that, pursuant to FAR 15.202, "a multi-phased approach w[ould] be used to determine the overall best value to the Government for [the]

---

[5] The Act established a mechanism by which states may "opt-out" of the nationwide radio access network and instead "submit an alternative plan for the construction, maintenance, operation, and improvements of the radio access network" in that state. See 47 U.S.C. §§ 1442(e)(3)(A), (C)(i). Any opt-outs will not occur until the "completion of the [NPSBN] request for proposal process." Id. § 1442(e)(1).

acquisition." Id. at 1435. "In light of [FirstNet's] objective-based acquisition approach and the unique nature of the FirstNet program," the RFP explained, "the Government w[ould] consider unique, innovative approaches to achieving an overall best value solution." Id. Further, "[a]s part of the multi-phased approach," the government "reserve[d] the right to request Offerors to conduct oral presentations and/or technical demonstrations." Id.

The evaluation would have four phases: (1) Capability Statements, (2) Solicitation Conformance, (3) Pass/Fail, and (4) Detailed Evaluation. Id. at 1435–37. In the first three phases, the agency would winnow out unqualified offerors and proposals with obvious flaws. See id. If a proposal made it to the fourth phase, the government would conduct a "detailed evaluation of all information and documentation received from the Offeror[]." Id. at 1437. Through this detailed evaluation, the government would "determin[e] and analy[ze] [the] strengths, weaknesses, and risks of [the] proposed solution" based on a multiplicity of evaluation factors and subfactors, which are discussed in part below. Id. at 1438; see also id. at 1438–56.

The primary evaluation factors were (1) Business Management; (2) Coverage and Capacity; (3) Products and Architecture; (4) Past Performance; and (5) Value Proposition Assessment. Id. at 1438. As shown below, each of the first three factors included several sub-factors:

| Factor | Sub-Factors |
|---|---|
| Business Management | General |
| | Leadership and Program Management |
| | Public Safety Customer Acquisition |
| | Customer Care and Life-Cycle Sustainment |
| | Financial Standing |
| | Delivery Mechanism for State Plans |
| | Quality Assurance Surveillance Plan |
| | Deliverables Table |
| Coverage and Capacity | Coverage and Capacity Maps and Statistics |
| | Radio Access Network (RAN) Strategy and Solutions |
| | IOC Milestones for Coverage and Capacity |
| Products and Architecture | Services |
| | Applications |
| | Device Ecosystem |
| | Architecture and Infrastructure |
| | Operations |
| | Security |
| | Test Strategy |

See id. at 1438–54.

The fifth factor, Value Proposition Assessment, also had two components. Id. at 1455–56. First, the agency would assess the net present value (NPV) of the offeror's proposed payments to FirstNet. Id. at 1455. Next, it would "evaluate the overall value proposition of the Offeror's pricing volume to determine if an unbalanced or unreasonable valuation exists." Id. An unbalanced or unreasonable valuation would exist "where the price of one or more nationwide or state elements is significantly overstated or understated despite an acceptable total overall value proposition." Id. To determine if prices were understated or overstated, the agency would "assess the degree to which proposed payments to the Contractor accurately reflect the effort described in the technical volume as it correlates to the IOC/FOC milestones."[6] Id. at 1456. Further, the agency would "assess the proposed approach pertaining to the drawdown of the aggregate total of $6.5 billion of budget authority and the proposed payments to the Contractor for each IOC and FOC milestone." Id.

Rather than evaluating risk as a separate factor, the agency would include an evaluation of risk within its evaluation of each factor and/or sub-factor. Id. The solicitation defined "risk" as "any aspect of an Offeror's proposal that could have significant negative consequences for the Government." Id.

Upon completing its evaluation, the government would award the contract to "the responsible Offeror whose offer . . . provide[d] the overall best value to the Government, when all evaluation factors [we]re considered." Id. at 1437. The first factor, Business Management, would be considered the most important. Id. at 1438. The second and third factors, Coverage and Capacity and Products and Architecture, would be given equal importance. Id. Together, the first three factors would be more important than the fifth factor, Value Proposition Assessment. Id. Finally, Value Proposition Assessment would be more important than Past Performance. Id.

Further, "[d]ue to the unique nature of FirstNet and the NPSBN," the government planned to conduct a trade-off analysis that "utilize[d] the results of [the] value proposition assessment . . . and non-price factors to determine the overall best value solution," rather than a "traditional trade-off analysis where the Government [would] consider[] price and non-price factors." Id. at 1437 (emphasis omitted). The government also "reserve[d] the right to remove an Offeror's proposed solution from further consideration" if the government determined that the proposal was "unacceptable in any of the evaluation factors and/or sub-factors." Id. at 1438. The solicitation did not include a statement that the agency intended to make an award without discussions. As addressed

---

[6] "IOC" stands for "Initial Operational Capability," defined as "the state achieved when a capability is available in its minimum usefully deployable form." AR Tab 30 at 934. "FOC" stands for "Final Operational Capability," meaning that "the activity has reached full maturity with all users able to exercise all intended capabilities." Id. at 932. The agency's target milestones put FOC for the network at sixty months (i.e., five years) from the date of award. See id. at 1335–38.

in more detail below, however, it did state that individual offerors might be eliminated without discussions under certain conditions. See id. at 1435.

## IV.    Proposal Evaluation

After issuing the solicitation, the government received capability statements from [ . . . ] potential offerors. See id. Tab 70 at 10391. On April 11, 2016, the agency determined that [ . . . ] of the potential offerors, including Rivada and AT&T, were viable competitors for the award. See id. The agency then provided written feedback and held face-to-face feedback sessions with each viable offeror. See id. Following those sessions, Rivada and AT&T submitted their complete proposals on May 31, 2016. See id.; see also id. Tab 52 (Rivada's proposal); id. Tab 53 (AT&T's proposal).

Soon after Rivada submitted its proposal, the agency began to send it written questions requesting clarifications. See id. Tabs 58, 63. Rivada's and AT&T's proposals passed phases two and three of the evaluation, and the government began the detailed evaluation. See id. Tab 70 at 10391. To that end, it convened a Source Selection Evaluation Board (SSEB) to evaluate the proposals' technical merits. See id. Tabs 65–68. It also elected to conduct oral presentations with the remaining offerors. Id. Tab 74 at 10441; see also id. Tabs 55–57.

Rivada's oral presentation took place on July 11, 2016. See id. Tab 74 at 10441. The presentation included a question and answer (Q&A) session. See id.; see also id. Tab 56. Before the presentation, the government explained that the presentation would "not be evaluated separately" from Rivada's proposal. Id. Tab 74 at 10441 (emphasis omitted). Rather, "the information obtained during the session [would] be used as part of the overall evaluation." Id. According to Rivada, its presentation and Q&A session lasted approximately seven hours. Pl.'s Mem. in Supp. of Pl.'s Mot. for J. on the Admin. R. (Pl.'s Mem.) at 13, ECF No. 46-2.

The government sought additional written clarifications in the wake of Rivada's oral presentation. See AR Tab 58. It similarly requested clarifications from AT&T, both before and after its oral presentation.[7] See id. Tabs 62, 64.

The SSEB ultimately produced several reports documenting its conclusions, including a Past Performance report; a Small Business Subcontracting Plan report; and, for each individual offeror, a Business Management Evaluation, a Technical Evaluation, a Pricing Evaluation, and a Preliminary Responsibility Assessment. See id. Tabs 65–68.

---

[7] To the extent the contents of these questions are relevant to the Court's decision, they are discussed in more detail below.

## V.      The Agency's Competitive Range Determination

On October 17, 2016, the agency's Source Selection Authority (SSA) eliminated Rivada from consideration and "enter[ed] into a competitive range of one" with AT&T.[8] Id. Tab 70 at 10389–90. The SSA's reasoning is discussed below.

### A.      Rivada's Proposal

The SSA first discussed the SSEB's conclusions regarding the "strengths, weaknesses, significant weaknesses[,] and deficiencies" of Rivada's proposal. Id. at 10393. As strengths, the SSA noted that Rivada's "proposed 'members' are industry leaders with substantial experience in their respective areas, including wireless infrastructure and public safety." Id. at 10394. Further, Rivada proposed a "purpose-built, public safety focused network which offers a low market-entry price-point," which "could encourage adoption and use of the NPSBN." Id.

On the other hand, the SSA identified numerous deficiencies and weaknesses in Rivada's proposal. Id. at 10394–96. The first set of deficiencies related to "Rivada's lack of financial stability, capacity, and required funding." Id. at 10394. The SSA noted that Rivada's proposal depended on "substantial third-party funding" to augment the funding provided by the government. Id. He determined, however, that Rivada "did not provide acceptable evidence demonstrating that it could obtain" such funding. Id. Further, the SSA explained that "Rivada's proposed strategy [wa]s risky" because it "utilized aggressive business assumptions" to account for "the [ . . . ] [it would need] to fulfill its business plan." Id.

A related deficiency concerned Rivada's "proposed wholesale marketplace for excess spectrum capacity." Id. The SSA noted that Rivada's plan "require[d] a robust[] wholesale market in which customers w[ould] purchase FirstNet's Band 14 excess spectrum capacity." Id. According to the SSA, the wholesale marketplace was one of two components in Rivada's plan to sell excess spectrum capacity. Id. The other involved [ . . . ]. Id. Assessing both components, the SSA determined that Rivada "did not adequately demonstrate that its proposed wholesale marketplace or [ . . . ] would be adopted by potential customers," creating "a significant risk of unsuccessful performance." Id.

Further, the SSA observed that "[b]efore wholesale customers are able to purchase excess spectrum capacity, Rivada must ensure [that] there are a sufficient number of end-user devices that can operate on Band 14." Id. at 10395. But because [ . . . ]. Id. In the SSA's view, this shortcoming "w[ould] negatively impact user

---

[8] The memorandum setting forth the basis for this decision was apparently drafted by the Chair of the SSEB and adopted by the SSA. See AR Tab 70 at 10388, 10408. For clarity, the Court discusses this memorandum as if written by the SSA.

adoption," creating a risk because without "[ . . . ], [Rivada] w[ould] not be able to sell sufficient spectrum capacity . . . to . . . meet its obligations to the Government." Id.

Relatedly, the SSA determined that Rivada had also "overstate[d] [its] device connection targets by [ . . . ]." Id. Rivada's proposal "count[ed] anyone accessing the FirstNet applications store as a device connection, even if that user is not a subscriber to the NPSBN." Id. According to the SSA, though, such [ . . . ] did not meet the solicitation's definition of a "device connection." See id. Thus, Rivada's "proposed solution may over-count the actual number of device connections," creating a further risk of insufficient revenue. See id.

Beyond these financial concerns, the SSA also identified additional significant weaknesses stemming from Rivada's "lack of executed agreements with the proposed members of the Rivada team for their respective scopes of work in the construction and operation of the NPSBN." Id. Absent executed agreements, the SSA noted that "formal commitments by Rivada's partners must be established post-award, and FirstNet would have to take on faith that Rivada [would be] able to reach final agreement[s] with its partners in a timely manner and without impacting the NPSBN program or timeline." Id. The SSA expressed particular concern with Rivada's lack of an executed agreement with [ . . . ]. Id. Under Rivada's proposal, [ . . . ].[9] Id.; see also id. Tab 67 at 10054–55. Without this agreement in place, the SSEB could not assess Rivada's plans to provide network capacity during that period. See id. Tab 67 at 10054–55.

The SSA also found that Rivada's proposed pricing structure for payments from FirstNet to Rivada was "risky." Id. Tab 70 at 10394. He noted that Rivada had proposed immediate payments from FirstNet of [ . . . ] for the first two Day 1 Task Orders (Delivery Mechanisms for State Plans and State Plan Development Task Orders). Id. According to the SSA, these payments were "materially overstated compared to FirstNet's Independent Government Cost Estimate (IGCE)." Id.

Based on the evaluation, Rivada's proposal merited the following adjectival ratings:

| Factor/Subfactor | Rating |
|---|---|
| **Business Management** | **Unacceptable** |
| General | Unacceptable |
| Leadership and Program Management | Unacceptable |
| Public Safety Customer Acquisition | Unacceptable |
| Customer Care and Life-Cycle Sustainment | Acceptable |
| Offeror's Financial Sustainability | Unacceptable |
| Delivery Mechanism for State Plans | Acceptable |

---

[9] [ . . . ].

| Quality Assurance Surveillance Plan | Unacceptable |
|---|---|
| Deliverables Table | Acceptable |
| **Coverage and Capacity** | **Acceptable** |
| Coverage and Capacity Maps and Statistics | Exceptional |
| RAN Strategy and Solutions | Acceptable |
| IOC Milestones for Coverage and Capacity | Acceptable |
| **Products and Architecture** | **Unacceptable** |
| Services | Acceptable |
| Applications | Acceptable |
| Device Ecosystem | Unacceptable |
| Architecture and Infrastructure | Unacceptable |
| Operations | Unacceptable |
| Security | Unacceptable |
| Test Strategy | Unacceptable |
| **Past Performance** | **Acceptable** |

Id. at 10396, 10404. The SSA noted that "[a]lthough the number of strengths, weaknesses, and/or deficiencies [was] not controlling, Rivada's proposed approach contain[ed] deficiencies and/or [a] combination of significant weaknesses that, if accepted, would introduce excessive, increased risk," making successful performance "highly unlikely." Id. at 10396.

Moving to the Value Proposition Assessment, the SSA observed that Rivada's proposed payments to FirstNet had "a Net Present Value (NPV) of [ . . . ] ([ . . . ] of undiscounted cash flows) over the 25-year contract period," and that it "forecasted [ . . . ] of total revenues over 25 years"—" [ . . . ] generated from public safety users and [ . . . ] from the sale of excess network capacity via a wholesale business model." Id.

Based on the evaluation detailed above, however, the SSA "concluded that Rivada's business model contains inherent risks that could negatively impact its financial sustainability." Id. These included Rivada's "need to secure substantial third-party financing" and its "dependence on Band 14 device adoption, which it did not demonstrate it could secure." Id.

Further, the SSA found that "certain cost elements" in Rivada's proposal were not reasonable. Id. at 10397. In particular, the SSA observed that "Rivada's proposed 'Payments to Contractor' amounts . . . [we]re materially overstated for [ . . . ] relative to expected costs." Id.

### B.   AT&T's Proposal

According to the SSA, AT&T's proposal had "substantial strengths . . . as well as some weaknesses and deficiencies." Id. at 10401. Among other strengths, the SSA noted AT&T's "significant experience building and operating nationwide wireless systems and . . . commercializing spectrum capacity." Id. Further, AT&T's "existing position as a commercial wireless service provider" meant that it would "be able to construct, operate, and maintain the NPSBN [ . . . ], serve public safety users, commercialize the excess spectrum capacity, and make the required [p]ayments to FirstNet." Id.

In addition, the SSA found that AT&T's "solution of [ . . . ]." Id. It could achieve this "in part . . . by leveraging its extensive relationships with device manufacturers and its subscriber base of 130 million customers to ensure the manufacture of Band 14 compatible devices." Id.

On the other hand, weaknesses in AT&T's proposal included (among other things) AT&T's failure to "provide evidence of executed teaming arrangements with core subcontractors" and the fact that its "overall proposed adoption targets [we]re low, as [it] propose[d] a penetration rate of [ . . . ] of the addressable market for extended primary public safety users." Id. at 10402.

Based on the evaluation, AT&T's proposal garnered the following adjectival ratings:

| Factor/Subfactor | Rating |
|---|---|
| **Business Management** | **Acceptable** |
| General | Exceptional |
| Leadership and Program Management | Acceptable |
| Public Safety Customer Acquisition | Highly Acceptable |
| Customer Care and Life-Cycle Sustainment | Exceptional |
| Offeror's Financial Sustainability | Exceptional |
| Delivery Mechanism for State Plans | Highly Acceptable |
| Quality Assurance Surveillance Plan | Unacceptable |
| Deliverables Table | Acceptable |
| **Coverage and Capacity** | **Acceptable** |
| Coverage and Capacity Maps and Statistics | Highly Acceptable |
| RAN Strategy and Solutions | Acceptable |
| IOC Milestones for Coverage and Capacity | Acceptable |

| Products and Architecture | Acceptable |
|---|---|
| Services | Acceptable |
| Applications | Acceptable |
| Device Ecosystem | Highly Acceptable |
| Architecture and Infrastructure | Acceptable |
| Operations | Unacceptable |
| Security | Acceptable |
| Test Strategy | Acceptable |
| **Past Performance** | **Highly Acceptable** |

Id. at 10402, 10404. Overall, the SSA determined that "there [was] a reasonable probability of success and little risk that AT&T's proposed solution would fail to meet the [solicitation's] quantity, quality, and schedule objectives." Id. at 10402.

Turning to the Value Proposition Assessment, the SSA noted that, with respect to cash flow, AT&T proposed payments "with a NPV of[ . . . ] ([ . . . ] of undiscounted cash flows) over the 25-year contract period"—substantially [ . . . ] than the payments proposed by Rivada. Id. at 10403. AT&T also "estimated public safety revenue at [ . . . ]" over the life of the contract. Id. Unlike Rivada, AT&T did not estimate how much revenue it would generate by selling excess spectrum capacity. See id. The SSA observed, however, that the government's pricing evaluation team estimated that spectrum sales would likely generate between [ . . . ] and [ . . . ], "with a middle case of [ . . . ]." Id. Further, the pricing team "found AT&T's cost projections reasonable." Id.

The SSA also concluded that "AT&T's business model contain[ed] minimal risks that could negatively impact or harm FirstNet and the NPSBN's financial sustainability." Id. On the other hand, the SSA identified "several significant areas where AT&T's proposal had unbalanced pricing and/or increased risk to FirstNet." Id. Among these was the fact that AT&T proposed to extend Band 14 coverage to [ . . . ].[10] Id.

### C.    The SSA's Conclusion

Based on its evaluation, the SSA established a competitive range containing only AT&T's proposal. See id. at 10407. He observed that "[a]lthough each Offeror's proposed solution contain[ed] unacceptable ratings[] at the subfactor level, only AT&T['s] is considered acceptable (or higher) across all factors." Id. at 10405. Further, he noted that "[a]lthough AT&T's proposed solution contain[ed] a few significant weakness and deficiencies, none of them would introduce excessive, increased risk that would result in unsuccessful performance." Id. at 10406. Those weaknesses "would

---

[10] The manner in which the SSA arrived at this figure is the subject of one of Rivada's claims of error, and is discussed in more detail below.

potentially only require minor corrections to AT&T's proposed solution," which could be accomplished through discussions. Id.

By contrast, the SSA found that the "substantial number of significant weaknesses and deficiencies" in Rivada's proposal "introduce[d] excessive, increased risks" that might "result[] in [its] inability to perform." Id. Addressing these weaknesses would, in the SSA's view, "essentially require a complete revision of [Rivada's] business model[]." Id. For example, Rivada "would have to identify and secure additional debt to proceed," and, "[i]n many cases, the Government would require [Rivada's] teaming agreements, some completely nascent, to be finalized." Id. Thus, conducting discussions with Rivada would be "costly and time consuming, and would place a financial and scheduling burden on both the Government and all Offerors." Id. And "[e]ven with substantial changes to [its] proposal[] . . . Rivada['s offer] would not be considered among the most highly rated offers." Id. Accordingly, the SSA eliminated Rivada's proposal from the competitive range. Id. at 10407.

### D.      Debriefing and Request for Reconsideration

The contracting officer (CO) informed Rivada of the agency's decision on October 17, 2016. Id. Tab 71 at 10409. The CO noted that "[a]s stated in the solicitation, the competitive range [would consist] of the most highly rated proposals and those Offerors whose proposals have a reasonable chance of being selected for award." Id. Rivada's proposal, however, was "not among the most highly rated proposals." Id. Thus, the CO "excluded [Rivada's] proposal from the competitive range and [would] no longer consider[] it for award." Id.

Rivada requested debriefing on October 19, 2016. Id. Tab 73 at 10429. Two days later, the CO conducted the debriefing by letter. Id. Tab 74. Rivada then requested reconsideration, which the CO denied. See id. Tab 75 at 10600–02.

## VI.    This Action

Rivada filed its complaint in this Court on November 21, 2016. ECF No. 1. It alleged that the government committed a variety of errors in the evaluation and the competitive range decision. These included (1) improperly holding discussions with the offerors before establishing the competitive range, and failing to conduct those discussions in accordance with law, see Compl. ¶¶ 5–8; (2) failing to consider important aspects of Rivada's proposal with respect to the Business Management factor, and, as a consequence, erring in its Value Proposition Assessment, id. ¶¶ 9–10; (3) "applying unstated evaluation criteria, making unwarranted assumptions, misreading [Rivada's] proposal, or arbitrarily increasing the risk associated with a particular concern," id. ¶ 11; and (4) "ignor[ing] aspects" of its proposal and otherwise evaluating its proposal in a manner "inconsistent with the [RFP's] evaluation scheme," id. ¶ 12.

Based on these alleged errors, Rivada asked the Court to declare that its exclusion from the competitive range was arbitrary, capricious, and contrary to law and to issue an injunction barring the government from awarding the contract without "including

Rivada . . . in the competitive range, conducting discussions with Rivada . . . and evaluating [its proposal] in accordance with the Solicitation." Id. at 43.

AT&T intervened in the case, ECF Nos. 13, 20, and the government compiled and submitted an extensive administrative record, see ECF Nos. 29, 37. The parties have filed lengthy cross-motions for judgment on the administrative record. ECF Nos. 46, 55–56. The Court heard oral argument on the cross-motions on March 3, 2017. See Order, ECF No. 71.

## DISCUSSION

### I.     Jurisdiction

The Court of Federal Claims has "jurisdiction to render judgment on an action by an interested party objecting to . . . a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2012). A party is an "interested party" with standing to bring suit under 28 U.S.C. § 1491(b)(1) if the party "is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract." Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013). A bidder's direct economic interest would be affected by the contract award if, as a result of the alleged errors in the procurement, the bidder suffered a competitive injury or prejudice. Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (holding that "prejudice (or injury) is a necessary element of standing"); see also Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 694–95 (2010) (to determine standing, the court assesses "the impact that the alleged procurement errors had on a plaintiff's prospects for award, taking the allegations as true").

In a pre-award, post-evaluation protest, the protester meets this standard if, absent the alleged errors in the procurmenet, it would have a "substantial chance" of receiving the award; that is, if the protester "could have likely competed for the contract" but for the alleged errors. Orion Tech., 704 F.3d at 1348–49. Rivada claims that absent the errors it alleges, its proposal would have been eligible for inclusion in the competitive range and thus that it could likely have competed for the contract. Neither the government nor AT&T appears to challenge Rivada's standing, and the Court agrees that Rivada's allegations are sufficient to confer such standing upon it.

### II.     Standard of Review

#### A.     General Standard in Bid Protest Cases

The Court reviews challenges to procurement decisions under the same standards used to evaluate agency actions under the Administrative Procedure Act, 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Thus, to successfully challenge a procurement decision, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005).

This "highly deferential" standard of review "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)). Thus, the Court cannot substitute its judgment for that of the agency. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (holding that as long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion" (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (court should review agency action to determine if the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action"). Although "the ultimate standard of review is a narrow one," the court's "inquiry into the facts is to be searching and careful." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).

**B.**     **Standard Applicable to a Contracting Officer's Decision to Establish a Competitive Range of One**

Under the FAR, an agency must establish a competitive range "if discussions are to be conducted" during a procurement, and the competitive range must be "comprised of all of the most highly rated proposals." FAR 15.306(c)(1). It is well established that the contracting officer has "broad discretion in evaluating proposals and determining which, if any, fall into the competitive range." W & D Ships Deck Works, Inc. v. United States, 39 Fed. Cl. 638, 642–43 (1997) (citing Birch & Davis Int'l, Inc. v. Christopher, 4 F.3d 970, 973 (Fed. Cir. 1993)); see also Red River Comput. Co. v. United States, 120 Fed. Cl. 227, 239 (2015); Impresa Construzioni Geom. Domenico Garufi v. United States, 44 Fed. Cl. 540, 554–55 (1999), aff'd in relevant part, 238 F.3d 1324, 1340 (Fed. Cir. 2001); Rockwell Int'l Corp. v. United States, 4 Cl. Ct. 1, 3 (1983).

In Birch & Davis International, however, under the then-applicable regulations governing competitive range determinations, the Federal Circuit affirmed the use of a "close scrutiny" standard to review an agency's decision to establish a competitive range of one. See 4 F.3d at 973–74 (discussing the former regulation, FAR 15.609(a), which provided that "[t]he competitive range . . . shall include all proposals that have a reasonable chance of being selected for award" and that "[w]hen there is doubt as to whether a proposal is in the competitive range, the proposal should be included" (omission in original)). The competitive range regulation, however, has since been revised. It now gives the agency more flexibility to exclude offerors from the competitive range. See FAR 15.306(c) ("[T]he contracting officer shall establish a competitive range comprised of all of the most highly rated proposals . . . ."). Further, it does not contain any language that gives the benefit of the doubt to an offeror as to whether its proposal should be in the competitive range. See Federal Acquisition Regulation; Part 15 Rewrite; Contracting by Negotiation and Competitive Range Determination, 62 Fed. Reg. 51,224,

51,226 (Sept. 30, 1997) (explaining that following the revision, the government would no longer have to "[r]etain[] marginal offers in the range," as doing so "impose[d] additional, and largely futile, effort and cost on both the Government and industry").

Nevertheless, courts have occasionally applied the "close scrutiny" standard in cases arising after the FAR revision. See, e.g., L-3 Commc'ns EOTech, Inc. v. United States, 83 Fed. Cl. 643, 650–51 (2008); Chapman Law Firm Co. v. United States, 71 Fed. Cl. 124, 132 (2006), aff'd in relevant part sub nom Chapman Law Firm. Co. v. Greenleaf Constr. Co., 490 F.3d 934 (Fed. Cir. 2007). These courts, however, have not addressed the significance of the change in the regulatory language. See L-3 Commc'ns EOTech, 83 Fed. Cl. at 650–51; Chapman Law Firm, 71 Fed. Cl. at 132; but see Sys. Dynamics Int'l, Inc. v. United States, No. 16-710C, 2017 WL 495553, at *12–13 (Fed. Cl. Feb. 7, 2017) (declining to apply close scrutiny in light of the regulatory change).

The government argues that because the court in Birch & Davis International relied on the "reasonable chance of being selected" language found in the former regulation, the FAR rewrite effectively abrogated the close scrutiny standard. Def.'s Resp. in Opp'n to Pl.'s Mot. for J. Upon the Admin. R. & Cross-Mot. for J. on the Admin. R. (Def.'s Resp.) at 16–17, ECF No. 55. The Court agrees that the change in the regulatory language undermines the regulatory rationale for applying "close scrutiny" to an agency decision establishing a competitive range of one. The Court notes, however, that the revision did not affect the other underlying rationale that the Federal Circuit articulated for applying heightened scrutiny—i.e., "[t]o promote the . . . policy favoring competition while allowing contracting officers the full range of their discretion." See Birch & Davis Int'l, 4 F.3d at 974.

The Court nevertheless has concluded that it need not address the continuing vitality of the "close scrutiny" standard in this case. For the reasons discussed below, the agency's decision to exclude Rivada from the competitive range was clearly a reasonable one. Accordingly, whether a close scrutiny standard or a less rigorous standard of review is applied, Rivada's protest fails.

## III.   Merits

Rivada claims that the agency erred in two ways in its evaluation of the proposals. First, it contends that despite the agency's attempt to limit the scope of its early exchanges with the offerors, it in fact permitted them to revise their offers during the evaluation and thus entered into discussions before it formally established the competitive range. See Pl.'s Mem. at 19. Further, in its view, those discussions were misleading and not meaningful. See id. Second, it argues that the agency unreasonably assigned numerous deficiencies and weaknesses to its proposal while often overlooking equivalent flaws in AT&T's proposal. See id. at 31–32.

The common thread stringing these arguments together is that the agency had an unstated preference for awarding the contract to a large, established wireless carrier. See Pl.'s Reply & Resp. to Def. & Def.-Intervenor's Cross-Mots. for J. on the Admin. R. (Pl.'s Reply) at 21, ECF No. 60. Thus, Rivada posits that the agency permitted AT&T to

revise its proposal during the pre-competitive range exchanges and assumed AT&T could correct other deficiencies through discussions, while denying Rivada the same opportunity. See Pl.'s Mem. at 22–24; Pl.'s Reply at 14–18. And it complains that the agency applied various unstated evaluation criteria to its proposal; that those criteria would have knocked out any proposal other than one submitted by a nationwide wireless carrier; and that, based on its unstated preference, the agency unjustifiably treated AT&T's proposal more favorably than Rivada's even when the proposals shared substantially equivalent weaknesses. See Pl.'s Mem. at 36, 38–40, 42–47, 51–53; Pl.'s Reply at 23–24, 26–28, 33–37, 41–42.

For the reasons discussed below, the Court concludes that Rivada's arguments lack merit. The pre-competitive range exchanges were not "discussions" because the exchanges were reasonably limited in scope given the complexity of the procurement, and because the agency neither intended to allow proposal revisions nor effectively accepted revised proposals. Further, the agency assessed the proposals thoroughly and evenhandedly against criteria set forth in the solicitation. Those criteria made clear that minimizing the risk of non-performance was of tantamount importance to the agency—a position that is fully justified by the crucial role the NPSBN will play in responding to emergencies of national importance. Accordingly, the fact that the agency included only AT&T's proposal in the competitive range does not demonstrate that the government applied an unstated preference for a large carrier; it merely reflects the agency's reasonable determination that Rivada's proposal carried too much risk.

### A.    Whether the Agency Entered Into Discussions With the Offerors

Rivada's first argument is that the government entered into discussions with the offerors based on the exchanges and oral presentations it held with them before establishing the competitive range. It further contends that those discussions did not comport with the FAR because they were misleading and not meaningful. See Pl.'s Mem. at 19–31. For the reasons set forth below, the Court finds Rivada's contentions meritless.

### 1.    Relevant FAR Provisions

FAR 15.306(d) defines discussions as negotiations that "take place after establishment of the competitive range" and that "are undertaken with the intent of allowing the offeror to revise its proposal." Id. In conducting discussions, the CO "must . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." Id. § 15.306(d)(3). COs are also "encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award." Id.

By contrast, exchanges that occur before establishing the competitive range are considered either "clarifications" under FAR 15.306(a) or "communications" under FAR 15.306(b). "Clarifications" are "limited exchanges" that the agency may engage in when "award without discussions is contemplated." Id. § 15.306(a)(1). They give an offeror

"the opportunity to clarify certain aspects of [its] proposal[] . . . or to resolve minor or clerical errors." Id. § 15.306(a)(2).

"Communications" are more elaborate exchanges that an agency may initiate with "those offerors . . . whose exclusion from, or inclusion in, the competitive range is uncertain."[11] Id. § 15.306(b)(1)(ii). Communications "[m]ay be conducted to enhance [the] Government['s] understanding of proposals; allow reasonable interpretation of the proposal[s]; or facilitate the Government's evaluation process." Id. § 15.306(b)(2). They may also "be considered in rating proposals for the purpose of establishing the competitive range." Id. They may not, however, "be used to cure proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal, and/or otherwise revise the proposal." Id.

**2.    Application of FAR Definitions**

In applying the definitions set forth in the FAR, "the 'acid test for deciding whether discussions have been held is whether it can be said that an offeror was provided the opportunity to revise or modify its proposal.'" Davis Boat Works, Inc. v. United States, 111 Fed. Cl. 342, 353 (2013) (quoting Linc Gov't Servs., 96 Fed. Cl. at 717); see also Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1322 (Fed. Cir. 2003) ("[W]hen discussions are opened, bidders have the opportunity to revise their proposals."). Rivada contends that the exchanges that took place before the competitive range was established in this case, including the oral presentations, amounted to discussions because the exchanges were "extensive" and because, according to Rivada, the agency "allowed the offerors to offer changes to their proposals." See Pl.'s Mem. at 22. The Court finds Rivada's arguments unpersuasive.

First, the extensive nature of the exchanges does not, in the Court's view, transform them into discussions. The procurement itself was complex and involved technical matters. Indeed, the government's acquisition plan described the procurement as "unique" and "unprecedented." AR Tab 28 at 678, 685. Further, the multi-phased evaluation process clearly contemplated that the evaluation would include a series of exchanges before the agency established a competitive range. Thus, the government informed offerors that it would provide them with "feedback" when it evaluated their capability statements in the procurement's first phase, and that the feedback would "identif[y] [the] strengths and/or weaknesses" noted in those statements. Id. Tab 30 at 1436. Further, as part of its detailed evaluation of the proposals, the government stated that it might consider "oral presentations and/or technical demonstrations or other

---

[11] Agencies also must engage in communications with "offerors whose past performance information is the determining factor preventing them from being placed within the competitive range," in which case the communications must "address adverse past performance information to which an offeror has not had a prior opportunity to respond." FAR 15.306(b)(1)(i).

discussions."[12] Id. at 1437. Therefore, given the unusual nature of the procurement, the large volume of exchanges does not indicate that the agency engaged in discussions.[13]

Second, the exchanges were not intended to, and in fact did not provide the offerors an opportunity to revise their proposals. Indeed, the record shows that the agency's intent—to which the Court grants weight in determining how the oral presentations should be characterized—was to not accept revisions until after it established a competitive range. Thus, when it requested information from the parties, the government consistently disclaimed any intent to accept revised proposals. See, e.g., id. Tab 63 at 9010, 9022, 9056, 9077, 9232, 9298, 9423; id. Tab 64 at 9671, 9734, 9797, 9920. The government's internal communications also show that it sought to ensure that the oral presentations would not stray beyond the bounds of communications under FAR 15.306(b) and into discussions. See id. Tab 63 at 9220–23 (email stating that the agency "need[ed] to ensure that any documentation that [Rivada] submit[s]" in the course of the

---

[12] Rivada argues that this reference to "other discussions" shows that the solicitation "clearly contemplated that [the] oral presentations would be part of discussions." See Pl.'s Mem. at 21–22. The Court does not agree. Rivada's argument depends upon the Court finding that the agency used the phrase "other discussions" in this section of the RFP in a technical, legal sense. But, as noted, the reference appears in a portion of the solicitation describing the "detailed evaluation" phase of the procurement. See AR Tab 30 at 1437. In keeping with FAR 15.306(c), the solicitation then noted that "after evaluating all proposals," the government might establish a competitive range. Id. at 1457. Given the context in which it appears, the Court thus declines to read the reference to "other discussions" as signifying that the agency intended that discussions within the meaning of FAR 15.306(d) would occur in the context of any oral presentations or technical demonstrations the agency might conduct during the evaluation process.

[13] The cases Rivada cites on this point are readily distinguished. See Pl.'s Mem. at 21 (citing Info. Tech., 316 F.3d at 1316; DynCorp Int'l, LLC v. United States, 76 Fed. Cl. 528, 535 (2007), and Linc Gov't Servs., 96 Fed. Cl. at 706). To begin with, those cases all apparently involved clarifications under FAR 15.306(a), with the government contemplating award without discussions, and not exchanges leading to the establishment of a competitive range under FAR 15.306(b). See Info. Tech., 316 F.3d at 1316; Linc Gov't Servs., 96 Fed. Cl. at 715; DynCorp Int'l, 76 Fed. Cl. at 531–32. Relatedly, the procurements at issue were in the mine run of ordinary procurement cases, and thus did not present complex or unique issues. See Info. Tech., 316 F.3d at 1315 (Air Force sought "professional services in support of its Space Warfare Center" for a one-year period); Linc Gov't Servs., 96 Fed. Cl. at 681–82 (U.S. Army sought civilian personnel to gather human intelligence in Iraq); DynCorp Int'l, 76 Fed. Cl. at 531 (Air Force sought maintenance service for T-38 aircraft at three bases).

oral presentation "does not amend, update, or revise their original proposal submission," and quoting FAR 15.306(b)).[14]

Further, as AT&T points out, language in the agency's instructions regarding the oral presentations closely tracked the language of FAR 15.306(b). See id. at 9216; id. Tab 64 at 9717 (informing the parties that "communications [would] be necessary in order to enhance FirstNet's understanding of the proposal[s], allow reasonable interpretation of the proposed solution[s], and facilitate the evaluation process"; and that the communications "may be considered in rating the proposal[s] for the purpose of establishing the competitive range," but would not "be used to cure proposal deficiencies or material omissions, materially alter the technical or cost elements, impact the overall value proposition of the proposal, and/or revise the proposal"). Thus, the agency clearly did not intend to allow the offerors to revise their proposals through the exchanges and oral communications that occurred during the detailed evaluation phase.

The content of the exchanges also shows that the agency used the exchanges only in service of performing a baseline assessment of the proposals as received, against which future, targeted revisions might occur. As the government points out, the vast majority of the agency's questions were straightforward requests for technical information about ambiguities or gaps in the offerors' proposals. See Def.'s Resp. at 31. Rivada, however, points to isolated questions that asked the offerors to "talk about" certain aspects of their proposals. See Pl.'s Mem. at 22 (citing AR Tab 58 at 8685, 8700, and AR Tab 62 at 8965, 8968). Despite this locution, the questions Rivada identifies all sought information about the parties' proposals as they existed. That is, the agency did not ask the offerors to supply new information from outside the four corners of their proposals. See AR Tab 58 at 8685 ("[T]alk about the proposed sequence and timing . . . pursuant to Rivada's proposed Integrated Master Schedule[.]"); id. at 8700 ("Based on your proposed solution, talk about . . . . :"); id. Tab 62 at 8965 ("Please talk about your current rationale . . . ."); id. at 8968 ("[T]alk about AT&T's proposed resource strategy . . . .") (all emphasis added).

Rivada also charges the agency with allowing AT&T to revise its proposal in response to two questions related to its proposed Band 14 coverage. See Pl.'s Mem. at 22–23. It is apparent to the Court, however, that the agency asked these questions to permit it to resolve an ambiguity in AT&T's proposal about the geographic extent of AT&T's proposed network. See AR Tab 62 at 8936–37 (requesting a clarification regarding how AT&T calculated the land area that would be covered by Band 14); id. at 8956 (noting a discrepancy between AT&T's Band 14 map and its description of the extent of its Band 14 coverage). Specifically, the ESRI and MapInfo files AT&T submitted with its proposal showed that AT&T's Band 14 coverage would extend to

---

[14] The Court notes that due to an apparent continuity error in the administrative record, the text of this email is found on pages 9220 and 9223 of Tab 63, while pages 9221 and 9222 appear to contain the text of an attachment.

[ . . . ]. See id. at 8936–38. In its technical response, however, AT&T stated that figure at [ . . . ]. See id.

AT&T responses to the agency's questions explained that the discrepancy resulted from its inadvertent failure to account in its technical response for [ . . . ] that were included in its maps. See id.; see also id. at 8956. Rivada contends that AT&T's responses "reflect[ed] changes to its proposal to add information it failed to include in its proposal originally." Pl.'s Mem. at 23 (emphasis omitted). But as the Federal Circuit has observed, "[a]ny meaningful clarification . . . . require[s] the provision of information," and there is "no requirement" that the information provided "not be essential for evaluation of the proposal." Info. Tech., 316 F.3d at 1323; see also Office Depot, Inc. v. United States, 95 Fed. Cl. 517, 543–44 (2010). Here, AT&T's responses simply made clear that the omission of the [ . . . ] from one part of its proposal caused the internal inconsistency identified by the agency. The agency thus did not seek a proposal revision; nor did AT&T provide one.[15]

Finally, Rivada claims that the agency also permitted it to revise its own proposal before establishing the competitive range. Pl.'s Mem. at 24–25. Specifically, it contends that the agency's evaluators changed their initial determinations about two aspects of Rivada's proposal following its oral presentation: its proposed Local Control solution and its proposed Public Safety Entity Home Page. See id. The record shows, however, that the information Rivada provided clarified the intent of its original proposal, rather than revising it. See AR Tab 56 at 2:10:13–2:11:25 (Rivada explaining during its oral presentation that [ . . . ]); id. Tab 67 at 10113 (noting that Rivada's oral presentation clarified that it had proposed [ . . . ]).

Because the agency neither intended to accept proposal revisions nor permitted the offerors to revise their proposals, its exchanges with the offerors did not amount to

---

[15] Indeed, after receiving AT&T's explanation, the SSEB evaluated AT&T under the "Coverage and Capacity Maps and Statistics" subfactor using [ . . . ]. See AR Tab 68 at 10233 (noting that AT&T's highly acceptable rating in that subfactor was "based on the original [i.e., lower] data supplied in AT&T's proposal submission"). Thus, the SSEB found AT&T's proposal "highly acceptable" under that subfactor even using a figure that was less favorable to AT&T. See id. at 10226, 10233. In the competitive range determination, on the other hand, the SSA mentioned the clarified figure, which included [ . . . ], when discussing the risk presented by the total area covered by AT&T's network. See AR Tab 70 at 10403 (stating that AT&T "proposed to provide Band 14 coverage [ . . . ]"). But because AT&T's response merely clarified a discrepancy in its proposal, the SSA's reasoning did not rest on a change to AT&T's proposal, but on information that was in AT&T's proposal from the start.

discussions. Accordingly, the Court concludes that the agency engaged only in communications with the offerors, not discussions.[16]

**B.**    **Whether the Government Erred in Eliminating Rivada from the Competitive Range**

Rivada also argues that the agency erred in several ways when it eliminated Rivada from the competitive range. As discussed below, each of Rivada's arguments lacks merit.

**1.**    **The Agency's Evaluation of Rivada's Plan to Monetize Excess Capacity**

Rivada first claims that the competitive range determination was flawed because the government "unreasonably focused" on just one aspect of its plan to sell excess spectrum capacity—namely, its [ . . . ]. Pl.'s Mem. at 34. As noted above, the SSA concluded that Rivada's plan to sell excess capacity "create[d] a significant risk of unsuccessful performance under the contract." AR Tab 70 at 10394. The SSA observed that "[u]nder the Rivada model, Rivada requires a robust, wholesale market in which customers will purchase FirstNet's Band 14 excess spectrum capacity." Id. Thus, if  the "wholesale marketplace, coupled with Rivada's [ . . . ], fail[ed] to gain traction with wholesale customers," then "Rivada's proposed business plan for the contract will fail." Id. In the SSA's view, however, "Rivada's proposal did not adequately demonstrate that its proposed wholesale marketplace or [ . . . ] would be adopted by potential customers." Id. Thus, Rivada's approach "create[d] a significant risk of unsuccessful performance under the contract." Id.

In reaching this conclusion, the SSA relied on the SSEB's assessment of Rivada's proposal, in which the SSEB concluded that there was a significant risk that Rivada's wholesale revenue projections were too rosy, even leaving aside Rivada's proposed [ . . . ]. See id. Tab 67 at 10178–79 (observing that Rivada's proposal relied on questionable projections of [ . . . ] and [ . . . ]). Rivada does not challenge the reasonableness of the SSEB's assessment of risk with respect to its wholesale market projections. Nor could it. In fact, the Price Evaluation Team determined that "Rivada would need to capture approximately [ . . . ] of the wholesale market by [ . . . ] in order to achieve its projected revenue from excess network capacity if the MVNO market (with expected growth) served as Rivada's only purchasers of excess network capacity." Id. at 10181.

The record thus plainly contradicts Rivada's argument that the SSA "ignored Rivada's proposed traditional wholesale approach entirely." Pl.'s Reply at 21; see also Pl.'s Mem. at 34–35. Rather, the SSA concluded that Rivada's proposal was risky based

---

[16] Because the Court has determined that the agency did not conduct discussions with the offerors, it does not reach Rivada's arguments that the discussions were misleading and not meaningful.

on an express finding that its proposal "did not adequately demonstrate that its proposed wholesale marketplace <u>or</u> [ . . . ] would be adopted by potential customers."[17] AR Tab 70 at 10394 (emphasis added).

Similarly, Rivada's argument that the agency "interjected an unstated evaluation criterion that no offeror could rely on the sale of excess capacity on the wholesale market" mischaracterizes the SSA's reasoning. The SSA merely found that the degree to which Rivada's proposal depended on projected (but questionable) wholesale market sales presented a significant risk of unsuccessful performance. Nothing about that reasoning suggests that the agency would have rejected out-of-hand a proposal that relied on a more reasonable set of wholesale market projections, or a different mix of wholesale market sales and other sources of revenue.

In sum, Rivada's objections to the SSA's risk determination with respect to its plans to sell excess capacity are without merit.

## 2.   The Agency's Evaluation of Rivada's Debt Financing Plan

Rivada also complains that the agency erred in identifying Rivada's reliance on substantial, unconfirmed debt financing as a deficiency in its proposal. As noted, the SSA determined that, to successfully perform the contract, Rivada would need to "obtain substantial third-party funding." <u>Id.</u> He concluded, however, that Rivada "did not provide acceptable evidence demonstrating that it could obtain" such financing. <u>Id.</u>

The SSA's determination rested on the SSEB's analysis of the financial sustainability of Rivada's proposed solution. <u>See id.</u> Tab 67 at 10070–76. In particular, the SSEB assessed the "[d]etails of source funding or financing to support the NPSBN." <u>Id.</u> at 10072. Among other sources, Rivada "propose[d] to secure approximately [ . . . ]." <u>Id.</u> To demonstrate its ability to secure that debt, Rivada "provided 'highly confident' letters from nine financial institutions." <u>Id.</u>

According to the SSEB, these letters "represent[ed] the banks' confidence in [their] ability" to secure financing for Rivada. <u>Id.</u> But they also included numerous conditions and caveats. In particular, the letters specified that the banks' willingness to provide the financing [ . . . ]. <u>Id.</u> Further, the SSEB observed that the letters stated that [ . . . ]; noted that the banks [ . . . ]; and did not [ . . . ]. <u>Id.</u> In light of these conditions and caveats, the SSEB determined that the letters, on their faces, did not constitute "an acceptable commitment to provide financing for Rivada" under FAR 9.104-3(a), which states that "[a]cceptable evidence normally consists of a commitment or explicit arrangement[] that will be in existence at the time of contract award." <u>Id.</u> at 10073.

---

[17] Rivada's argument that the SSEB report "provides no reason to question Rivada's proposal to utilize the traditional wholesale model" is similarly off base. <u>See</u> Pl.'s Reply at 21. The SSEB expressly found that Rivada's proposal relied on two assumptions that it found questionable: that [ . . . ], and that [ . . . ]. <u>See</u> AR Tab 67 at 10178–79.

Further, the existence of the conditions concerned the SSEB because it found reason to doubt that the banks would, in fact, be willing to lend money to Rivada once they had completed their due diligence. Thus, the SSEB expected that "[p]otential lenders m[ight] require [ . . . ] in order to reduce the risk associated with debt financing." Id. Rivada's proposal, however, included [ . . . ]. Id.

Moreover, the SSEB believed that Rivada would "likely face significant challenges in collateralizing the assets related to the NPSBN contract to obtain the necessary financing" because the solicitation expressly "state[d] that NPSBN assets are not to become subject to any mechanic's or vendor's lien" and required that FirstNet, not the contractor, "remain the spectrum licensee post-award." Id. These provisions would "limit Rivada's ability to offer the FirstNet contract as collateral, or otherwise offer to transfer control of the network in order to support its ability to acquire acceptable financial funding." Id.

Rivada does not engage with the substance of these concerns. Rather, it posits broadly that the agency "wrongly rejected Rivada's 'highly confident' letters because they were not 'firm commitments' to provide financing." Pl.'s Mem. at 37. This misstates the essential basis for the SSA's conclusion, which was not that the presence of conditions in the letters, standing alone, made Rivada's proposal too risky. Rather, the SSA was reasonably concerned that, based on Rivada's financial situation and the restrictions in the solicitation, there was an unacceptably high likelihood that the banks might invoke those conditions, leaving Rivada without the financial capacity to even begin performance on the contract. Had the highly confident letters been paired with [ . . . ], for example, or if Rivada's strategy for monetizing excess capacity were sound, the agency may well have reached a different conclusion.

The Court is likewise unpersuaded by Rivada's claim that the agency's decision amounted to the application of an unstated criterion effectively prohibiting any reliance on debt financing. See id. at 38–39. As described, the agency's conclusion rested on two grounds: that Rivada would be unable to perform unless it obtained "substantial" debt financing, and that it failed to provide acceptable evidence that it could obtain that financing. AR Tab 70 at 10394. Had Rivada relied on debt financing to a lesser extent, or had it demonstrated a higher likelihood of obtaining that financing, the agency might have rated it differently. Rivada's argument thus lacks merit.

### 3. The Agency's Evaluation of Rivada's Proposed Teaming and Subcontracting Relationships

Rivada next contends that the agency erred by assigning it a significant weakness based on its "lack of executed agreements with the proposed members of [its] team." Pl.'s Mem. at 40 (quoting AR Tab 70 at 10395). Specifically, the SSA observed that Rivada "lack[ed] . . . executed agreements with the proposed members of the Rivada team for their respective scopes of work in the construction and operation of the NPSBN." AR Tab 70 at 10395. Of particular importance, the SSA noted that "[a]lthough Rivada's solution identifie[d] the use of [ . . . ], it d[id] not have an executed agreement in place to support this strategy." Id. According to the SSA, because "the formal commitments by

Rivada's partners" would not be in place until after the award, the agency "would have to take on faith that Rivada [would be] able to reach final agreement with its partners in a timely manner and without impacting the NPSBN program or timeline." Id.

Rivada's primary argument on this point—that the SSA wrongly imposed a "requirement" that Rivada have in place "executed subcontracts" pre-award—oversimplifies the agency's basis for assigning it this significant weakness. The SSEB report (on which the SSA relied) shows that the agency viewed Rivada's lack of executed subcontracts as but one symptom of an underlying problem: that Rivada's "proposed teaming agreements . . . fail[ed] to demonstrate any incentives or negative consequences in order to ensure the operation of the company to successfully build, deploy, and maintain the NPSBN." Id. Tab 67 at 10053–54.

Thus, of the five members of Rivada Mercury, LLC, [ . . . ]. Id. at 10054. Based on this lack of accountability, the SSEB concluded that [ . . . ]. Id. These concerns relate not to subcontracts that Rivada might eventually execute with the teaming members, but to the nature of the teaming agreements themselves. Had the teaming agreements bound the partners to one another and to the project in a more meaningful fashion, the agency might have had more confidence in the contributions each teaming member would make to the NPSBN's success.

The SSEB expressed similar qualms about Rivada's arrangement with [ . . . ]. See id. at 10055. Thus, it found that Rivada's "proposal indicated a stronger and more pervasive relationship [ . . . ] than appear[ed] to be actually provided in the [ . . . ] teaming agreement or Rivada's response to clarification questions regarding th[e] relationship." Id. For example, while Rivada represented in its proposal that it was "[w]orking with [ . . . ]," Rivada's teaming agreement with [ . . . ] was [ . . . ]. Id. (internal quotation omitted). Further, although the proposal stated that "[ . . . ] . . . will facilitate the seamless adoption of the NPSBN by [ . . . ]'s customers," the SSEB determined that there was, in fact, [ . . . ]. Id. Given the crucial role [ . . . ] would play during the build-out phase, the SSA's decision to assign Rivada a significant weakness based on [ . . . ]'s lack of an obligation was clearly justified.[18]

---

[18] Relatedly, Rivada contends that the agency erred by assigning it a weakness for failing to ensure that public safety users would [ . . . ] while overlooking a similar failure in AT&T's proposal. Pl.'s Mem. at 51–53. This argument also lacks merit. Under Rivada's proposal, the government could not be assured that [ . . . ]. See AR Tab 67 at 10068. Under AT&T's proposal, by contrast, most users would [ . . . ]. See id. Tab 68 at 10234 (noting that FirstNet users would [ . . . ]); id. Tab 59 at 8895 (noting that [ . . . ]"). Further, [ . . . ], which would [ . . . ]. See id. Tab 68 at 10227. Finally, the agency in fact assigned AT&T a significant weakness based on its failure to [ . . . ] for areas [ . . . ], which AT&T did not propose to [ . . . ]. See id. at 10238 (observing that [ . . . ] and that [ . . . ]). Rivada's objection thus glosses over the agency's nuanced assessment of the strengths and weaknesses in AT&T's proposal when it came to [ . . . ].

Further, Rivada's contention that it received unequal treatment with respect to teaming agreements and subcontracts is entirely without merit. The government and AT&T both acknowledge that AT&T's proposal did not include [ . . . ], and that the SSA viewed this as a weakness. See Def.'s Resp. at 48; Mem. of Points & Authorities in Supp. of Def.-Intervenor AT&T Corp.'s Cross-Mot. for J. on the Admin R. at 45, ECF No. 56-1; see also AR Tab 70 at 10402. Thus, the agency's treatment of this aspect of the proposals did not differ in kind, but only in the degree of the weakness assigned. See Sci. Applications Int'l Corp. v. United States, 108 Fed. Cl. 235, 273 (2012) ("Whether a concern is considered a Significant Weakness or a Weakness is well within the [agency's] discretion.").

Perhaps more importantly, the agency determined that AT&T "ha[d] the past performance to support its ability to partner with and successfully complete its awarded projects." AR Tab 70 at 10402. Rivada, on the other hand, "possesse[d] few capabilities, staff, or financial resources"; "d[id] not itself have material experience in . . . building and operating a nationwide wireless network"; and lacked any experience in "supervising a project of the size and scope of the NPSBN." Id. Tab 74 at 10446. It was therefore heavily reliant upon subcontractors "for virtually every material aspect of meeting its obligations under the contract." Id. Tab 52 at 5982.

Thus, to successfully complete performance, Rivada would need to enter into hundreds of subcontracts to complete the work it could not perform itself; but it lacked relevant experience managing subcontractors in ordinary settings, let alone in completing projects of this size and complexity. By contrast, because of its own capabilities, AT&T would need to enter fewer subcontracts; at the same time, it already had deep experience managing subcontractors in large-scale projects. Given this disparity, it was reasonable for the government to conclude that AT&T's lack of executed subcontracts posed less of a risk to the NPSBN's success than Rivada's facially similar deficiency.

### 4. The Agency's Evaluation of Rivada's Band 14 Device Portfolio and its Effect on Rivada's Financial Model

Rivada also contends that the agency erred in determining that Rivada "did not sufficiently demonstrate a plan to ensure [the] availability of Band 14 devices." Id. Tab 70 at 10395; see also Pl.'s Mem. at 45–47. According to the SSA, Rivada [ . . . ]. AR Tab 70 at 10395. As a result, "public safety users [and] wholesale customers would [ . . . ], which would "negatively impact user adoption." Id. Further, the SSA determined that "convincing device manufacturers to build devices that will operate on Band 14[] will require significant time, expense, and effort." Id. And because the availability of Band 14 devices was "critical to the success of [Rivada's] proposed solution," the SSA concluded that Rivada "w[ould] not be able to sell sufficient spectrum capacity in order to fulfill the requirements of its business plan" if it proved "unable to obtain the necessary Band 14 devices." Id.

The SSA's conclusions reflected shortcomings identified by the SSEB. Thus, the SSEB noted that Rivada's proposal specified only [ . . . ]; that the proposed devices [ . . . ]; and that the devices [ . . . ]. Id. Tab 67 at 10051. Based on these facts, the SSEB

concluded that Rivada "failed to demonstrate its ability to drive substantial subscribership and user adoption," and that it had not shown an "ability to meet the objective pertaining to speed to market." Id.

According to Rivada, the agency "ignored the demand side of the equation" in reaching these conclusions. Pl.'s Mem. at 46. In its view, "[t]he primary determinant of whether a device manufacturer will include the capability for a particular spectrum on its consumer devices is whether there is demand in the consumer marketplace for devices with that capability." Id. But the agency did not ignore demand; it concluded that Rivada's device portfolio would suppress demand. The Court finds no reason to disturb this conclusion.

As with its other arguments, Rivada also claims that the agency improperly evaluated AT&T's device portfolio more favorably than its own. Id. at 46–47. But the differences between the proposals are readily apparent. First, because AT&T planned to initially support FirstNet services [ . . . ], FirstNet would immediately "have access to AT&T's [ . . . ]." AR Tab 68 at 10210. The SSEB believed this head start would "help[] to drive early adoption" of the NPSBN. Id. Further, AT&T represented that it was [ . . . ]. Id. This would give customers reason to purchase devices with Band 14 capability before the actual rollout of the Band 14 network. See id.

AT&T also pledged that, after deployment of the Band 14 network began, it would "certify [ . . . ] new Band 14 public safety devices per [ . . . ]," and would ensure that at [ . . . ] Band 14 device was [ . . . ]. Id. at 10209–10. Finally, AT&T stated that it would [ . . . ]. Id. at 10210. The SSEB concluded that AT&T's "existing relationships" with the OEMs "mitigate[d] the risk that Band 14 w[ould] not be available in consumer mass-market devices in a timely fashion." Id.

Rivada criticizes the agency for "simply assum[ing]" that AT&T could use its existing relationships to "force device manufacturers to include Band 14 capability in new devices." Pl.'s Reply at 36; see also Pl.'s Mem. at 46–47. That was not the agency's conclusion. Rather, the agency judged that AT&T would successfully "drive early adoption" and thus stoke demand for Band 14 devices, which would in turn incentivize manufacturers to produce them. AR Tab 68 at 10210. Using its existing relationships to "mitigate[] the risk" that Band 14 devices would not be available "in a timely fashion" was one portion of AT&T's larger plan. Id. Rivada, on the other hand, "failed to demonstrate its ability to drive substantial subscribership and user adoption" and did not show an "ability to meet the objective pertaining to speed to market." Id. Tab 67 at 10051. The agency thus did not treat the proposals unequally. See A-T Sols., Inc. v. United States, 122 Fed. Cl. 170, 183 (2015) ("[O]fferors who are not similarly situated may be treated differently." (citation omitted)); Sci. Applications Int'l, 108 Fed. Cl. at 272 (observing that only "[s]ubstantively indistinguishable deficiencies must be evaluated evenly" (quotation omitted)).

**5.      The Agency's Treatment of Rivada's Proposed Device Connection Targets**

Rivada also claims that the agency erred in determining that Rivada's device connection targets were overstated. The solicitation defined a device connection as "a device on a post-paid contract with an eligible NPSBN user that has been generating billable revenue for three consecutive months." AR Tab 30 at 1303. In its proposal, Rivada counted as device connections [ . . . ]. See id. Tab 58 at 8733 (describing such connections as "over-the-top" connections).

The SSA determined that [ . . . ] was "inconsistent with FirstNet['s] interpretation[]" of the term "device connection." Id. Tab 70 at 10395. He based this conclusion on the SSEB's interpretation of the term "device connection," under which "a public safety entity whose data traffic from an end user device does not traverse both the Band 14 core and RAN is not considered to be a connection on the NPSBN." Id. Tab 67 at 10062.

The Court finds the agency's interpretation reasonable. When interpreting a solicitation provision, the court assesses the "plain and ordinary meaning" of the provision's terms considered in the context of "the solicitation as a whole." Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1353 (Fed. Cir. 2004) (citing Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003)). The court "interpret[s] [the provision] in a manner that harmonizes and gives reasonable meaning to all of [the solicitation's] provisions." Id. (citation omitted); see also Contract Servs. Inc. v. United States, 104 Fed. Cl. 261, 274–75 (2012) Linc Gov't Servs., 96 Fed. Cl. at 708; Masai Techs. Corp. v. United States, 79 Fed. Cl. 433, 443 (2007).

As noted, the solicitation defined a "device connection" as a connection made by "an eligible NPSBN user that has been generating billable revenue for three consecutive months." AR Tab 30 at 1303. The critical term in this definition is "eligible NPSBN user," which the solicitation did not define. Under the plain meaning of the terms, an "NPSBN user" is someone who uses the network itself—i.e., its physical architecture.

Further, the solicitation as a whole supports this reading of the term, as the government's financial and public safety objectives both depend on widespread use of the network itself. Thus, as noted, Congress authorized FirstNet to collect user fees from "each entity . . . that seeks access to or use of the [NPSBN]." See 47 U.S.C. § 1428(a)(1). Rivada, however, does not argue that it proposed to charge a fee to [ . . . ]; even it if did, or even if it charged a fee for [ . . . ], such intermittent income would not create the type of sustained revenue stream contemplated by Congress and the agency.

Moreover, the agency's public safety objectives depend upon the actual use of the Band 14 network infrastructure. Concentrating public safety communications in Band 14 is a crucial step toward remedying the lack of interoperability that presently hampers communications between different public safety entities. Counting users of [ . . . ] as "device connections" does nothing to further this goal.

In short, the plain meaning and the context of the solicitation as a whole both support the agency's exclusion of "entit[ies] whose data traffic from an end user device does not traverse both the Band 14 core and RAN" from the definition of a "device connection" under the solicitation. Accordingly, the agency did not err in assigning Rivada a weakness with respect to its device connection targets.

### 6.    The Agency's Evaluation of Rivada's Value Proposition

Rivada also claims that the agency erred in its assessment of the value proposition presented by Rivada's proposal. Pl.'s Mem. at 48–51. The SSA concluded (among other things) that "certain cost elements" within Rivada's proposal were unreasonable. AR Tab 70 at 10397. In particular, he observed that "Rivada's proposed 'Payments to Contractor' amounts . . . [were] materially overstated for [ . . . ] relative to expected costs compared to FirstNet's IGCE." Id.

The SSA based this determination on the SSEB's analysis of Rivada's proposed pricing. See id. Tab 67 at 10169–71. The SSEB found that "Rivada's strategy for pricing of [ . . . ] [was] unbalanced" and thus "potentially pose[d] an unacceptable risk to the project." Id. at 10171. First, the SSEB determined that Rivada's proposed payments of [ . . . ] for [ . . . ] and [ . . . ] for [ . . . ] were "a significant departure from the costs expected for such activities associated with the task order[s], as estimated in the IGCE." Id. at 10170. Further, the agency was concerned that if it paid out "[ . . . ] of the funds available for development of the nationwide elements . . . prior to implementation of the Core network," Rivada "would not have strong incentives and/or sufficient funding to perform on the other contractual elements, including the core network and eventually performance required by the state RAN task orders." Id. at 10171.

Regarding [ . . . ], the SSEB found that Rivada's proposal "to allocate [ . . . ] for [ . . . ] . . . through FOC" constituted "unbalanced pricing" because Rivada "would incur costs higher than payments" through the first five years of the contract. Id. at 10170. This "present[ed] a risk" because Rivada might lack "sufficient funding to support the critical task build-out and operation of the core network." Id.

These determinations were not erroneous or unreasonable. The solicitation informed offerors that the agency would "assess the degree to which proposed payments to the Contractor accurately reflect the effort described in the technical volume as it correlates to the IOC/FOC milestones." Id. Tab 30 at 1456. It also warned offerors that proposals might be rejected if the proposed pricing was "determined to be unbalanced" and "the lack of balance pose[d] an unacceptable risk to the Government." Id. at 1455. In addition, it noted that "[u]nbalanced or unreasonable pricing exists where the price of one or more nationwide or state elements is significantly overstated or understated." Id.

Applying this framework, the agency found that the amount of effort required to complete [ . . . ] did not justify the [ . . . ] in payments allotted for those Task Orders; and, conversely, that [ . . . ] would likely require more than [ . . . ] to complete. Notably, Rivada does not attempt to explain why it would require [ . . . ] to [ . . . ] or [ . . . ] to [ . . . ], or why it would require [ . . . ] to complete[ . . . ]. Rather, it contends generally

that its proposal as a whole "required a substantial capital commitment up front to cover the costs of placing substantial orders for telecommunications equipment," as well as for "network design and site acquisition." Pl.'s Mem. at 49–50. These vague assertions provide no basis for disturbing the agency's conclusions regarding the risks presented by Rivada's cost allocations.[19] And even if the high up-front costs it proposed were justified by Rivada's aggressive build-out plans, the agency would have ample reason to consider the plans themselves a risk to successful completion of the project. Accordingly, the SSA did not err in arriving at his conclusions with respect to the value proposition assessment.

### 7.    Whether the Agency Erroneously Double-Counted Certain Weaknesses

Rivada's final argument is that the agency improperly assigned it multiple weaknesses within certain subfactors based on a single perceived issue, which "had the effect of double-counting Rivada's evaluated . . . weaknesses." Id. at 54. This argument, too, lacks merit. To begin with, Rivada points to no source of law that stands for the principle it asks the Court to apply—i.e., that an agency may not assign multiple weaknesses within a subfactor based on a single factual predicate. Nor is such a rule compatible with the evaluation criteria the SSEB applied. The SSEB noted that a "weakness" was a "flaw in the proposal that increases the risk of unsuccessful contract performance"; that a "significant weakness" was "a flaw that appreciably increases the risk of unsuccessful contract performance"; and that a deficiency was "a material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level." AR Tab 67 at 10045. The agency's explanations show that it assessed multiple weaknesses within subfactors because the shortcomings in Rivada's proposal created multiple distinct risks. For example, under subfactor 2 (Leadership and Program Management), the agency found that Rivada's lack of an executed [ . . . ] would "have a negative impact on its speed to market for PSE users," id. at 10057, and also left

---

[19] Rivada attempts to undermine the agency's conclusions by arguing that the government's independent cost estimate did not account for the aspects of Rivada's proposal that increased its [ . . . ] costs. See Pl.'s Mem. at 50–51. Citing Alabama Aircraft Industries, Inc.-Birmingham v. United States, 83 Fed. Cl. 666, 696 (2008), rev'd, 586 F.3d 1372 (Fed. Cir. 2009), it contends that "an agency may not rely on its IGCE without first considering whether the offeror has proposed a technical approach that would result in costs different from [those found] in the IGCE." Pl.'s Mem. at 50. Assuming the relevant portion of Alabama Aircraft remains good law, the case does not support Rivada's position. In fact, Alabama Aircraft does not involve an independent cost estimate at all. Rather, the court in that case found that the government erred in a price realism analysis of a proposal because it relied on a flawed assumption about its own needs. See 83 Fed. Cl. at 699–700. Here, the government used the IGCE as a benchmark and found that the individual characteristics of Rivada's proposal did not justify its departures from the government's estimated prices. See AR Tab 67 at 10170. This approach was not erroneous.

the agency unsure whether Rivada could "achieve user adoption targets [or] meet the financial sustainability objective," id. at 10060.

Similarly, under subfactor 3 (Public Safety Customer Acquisition), the lack of an executed [ . . . ] created two distinct risks. First, absent an executed agreement, there was a risk that Rivada would "not have the ability to provide [ . . . ] service upon award." Id. at 10067. Second, even if Rivada could provide service upon award, the agency was unable to assess whether "monthly invoice[s] . . . loaded with incremental and other costs" would discourage public safety users from adopting the service because Rivada's proposal had no information about "pricing for [ . . . ], volume discounts, unlimited data plans, or roaming or LMR interoperability costs." Id. at 10067–68. In short, it was not irrational for the SSEB to identify multiple types of risks within a single subfactor that flowed from critical flaws in Rivada's proposal.

Further, the SSA did not make the competitive range determination by mechanically compiling the weaknesses identified by the SSEB and then eliminating those proposals that in his view had too many. Indeed, he specifically noted that "the number of strengths, weaknesses, and/or deficiencies is not controlling." Id. Tab 70 at 10396. Instead, he digested the SSEB's report and weighed the aspects of Rivada's proposal that were considered strengths against those that led to weaknesses and/or created risk. In conducting this sort of assessment, it is unsurprising that a single issue might result in more than one type of risk to successful contract completion. For example, Rivada's lack of executed teaming and subcontracting agreements presented two different types of risk: first, that Rivada might not have the financial resources to complete the project; and second, that even if Rivada had enough funding, it might lack the technical capacity to build the nationwide network it proposed. See id. at 10395; id. Tab 67 at 10058–59. The SSA thus did not err in considering the different ways in which individual facets of Rivada's proposal might affect its ability to perform the contract.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

In sum, Rivada's claims of error in the agency's evaluation all lack merit. Accordingly, the Court lacks any basis for disturbing the conclusions reached by the SSA. Whether subject to "close scrutiny" or some more deferential standard, Rivada's exclusion from the competitive range was not arbitrary, capricious, or contrary to law.

## CONCLUSION

For the reasons discussed above, Rivada's motion for judgment on the administrative record is **DENIED**, and the government's and the intervenor's cross-motions for judgment on the administrative record are **GRANTED**. The Clerk is directed to enter judgment accordingly. Each side shall bear its own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge